# UNITED STATE DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **Brooke N. Mann** <br> 856 Keystone Way <br> Louisville, Kentucky 40223 | : <br><br> : | |
| | | Case No: |
| Plaintiff, | : | |
| | | Judge: |
| **vs.** | : | |
| | | **COMPLAINT WITH JURY DEMAND ENDORSED HEREON** |
| **LNKBox Group, Inc.** <br> 600 S. Spring Street <br> Los Angeles, California 90014 <br> C/O Incorp Services, Inc. (Registered Agent) <br> 919 North Market Street, Suite 950 <br> Wilmington, Delaware 19801 | : <br><br> : <br><br> : <br><br> : | |
| and | : | |
| **Ryan Axford** <br> 246 Coronado Avenue <br> Long Beach, California 90803 | : <br><br> : | |
| and | : | |
| **FlexTram, LLC** <br> 71 Howard Street SE, Unit 3418 <br> Atlanta, Georgia 30317 | : <br><br> : <br><br> : | |
| Defendants. | : | |

## COMPLAINT

Now comes Plaintiff Brooke N. Mann ("Plaintiff"), and for her Complaint, states as follows:

## PARTIES

1. Plaintiff is domiciled in and a citizen of the State of Kentucky.

2. Defendant LNKBox Group, Inc. ("LNKBox") is a business entity organized and existing under the laws of Delaware, with its principal place of business in Los Angeles, California, doing business in the State of Ohio.

3. Defendant Ryan Axford ("Axford") is domiciled in and a citizen of the State of California, residing in Long Beach, California, doing business in the State of Ohio.

4. Defendant FlexTram, LLC ("FlexTram") is a business entity organized and existing under the laws of the State of Georgia, with its principal place of business in Atlanta, Georgia, doing business in the State of Ohio.

## JURISDICTION AND VENUE

5. This Court has diversity jurisdiction under 28 U.S.C. § 1332.

6. This Court has personal jurisdiction over all Defendants.

7. Plaintiff is a citizen of the State of Kentucky.

8. Defendants are citizens of states throughout the United States, but none are citizens of the State of Kentucky.

9. Venue is proper under S.D. Ohio Local Rule 82.1.

## FACTS AND CLAIMS COMMON TO ALL CAUSES OF ACTION

10. The Lost Lands Music Festival is a three-day dinosaur themed music festival presented and promoted to customers located at 7885 Kindle Road, Thornville, Ohio 43076-8818 where all factual events described in the Complaint took place that led to Plaintiff's injuries and losses.

11. The Lost Lands Music Festival and Legend Valley provided a camping area for a fee, removed from the stages and concert areas, where the thousands of concert goers can rent campsites to stay at for the three-day event including the Plaintiff.

12. The Owner/Promoters sold tickets to customers, including to Plaintiff, to the Lost Lands Music Festival for attendance and/or camping. At all relevant times, Plaintiff was a business invitee of the Owner/Promoters, Defendants LNKBox, Axford, and FlexTram for purposes of participating in all events available on the premises while attending the Lost Lands Music Festival at Legend Valley.

13. The Owner/Promoter communicated with festival attendees, including Plaintiff, via advertisements, websites, and through social media about purchasing tickets, renting camping space, directions, concessions, merchants and merchandise, concert arrival and departure, travel by shuttle and Tram vehicles, and traffic concerns.

14. The Lost Lands Music Festival took place from September 24 through 26, 2021.

15. Plaintiff and her friend purchased tickets to the 2021 festival on or about February 2021 for good and valuable monetary consideration who were at all times relevant business invitees and parties to the contract of admission on the premise. Plaintiff ordered and purchased her tickets online from Front Gate tickets on April 6, 2021.

16. Plaintiff purchased tickets for the entire three-day event, plus she purchased an additional ticket for early entry so that she and her friend could enter the Lost Lands Music Festival campground to establish temporary residence the day before the featured music started, on Thursday, September 23, 2021.

17. Plaintiff received two wrist bands for herself by USPS mail, and two wristbands for her friend by USPS mail. The wristbands were for early entry admission and to attend all festivities offered for the three-day festival.

18. Plaintiff also purchased a car parking and campsite pass permitting them to utilize the camping facilities during the multi day concert. This pass permitted Plaintiff and her friend to camp onsite and to park their car at the campsite. The car parking and campsite rental pass arrived by USPS mail with the admission wrist bands.

19. The Owner/Promoters engaged the services of Defendants LNKBox, Axford, and FlexTram, who provided the tractor and "Tram," a motorized vehicle that pulled Trailers full of concert business invitees/patrons to locations within the venue.

20. LNKBox is a California company that advertises transportation services combined with technology and advertising.

21. LNKBox provides targeted marketing experiences to passengers in the time they spend as passengers traveling from the parking lots or campgrounds to concert stages and venues.

22. LNKBox hired Axford as a driver of one of the LNKBox/FlexTram motorized vehicular Trams.

23. While LNKBox claims its drivers undergo rigorous training, upon information and belief, Axford had no prior experience and was otherwise incompetent to operate a Tram/Trailer.

24. LNKBox, Axford, and/or FlexTram obtained/leased the Trailer(s) that would be pulled by the Tram(s).

25. On September 23, 2021, Plaintiff and her friend drove from their home in Kentucky to Thornville, Ohio to attend the three-day Lost Lands Musical Festival held in Legend Valley from September 24-26, 2021.

26. While they had purchased early admission tickets for the event and camping, weather and traffic delays caused such a traffic problem that Plaintiff was unable to arrive at the campgrounds until early Friday morning on September 24, 2021.

27. At about 5 a.m. on September 24, 2021, Plaintiff was directed by Defendants' agents and assigns to a parking, and camping location at the Legend Valley and Apex/Lost Lands campgrounds of the music festival.

28. Plaintiff and her friend parked the car as directed, unloaded their belongings, and set up their camp site, finishing around 10:00 a.m.

29. Plaintiff walked the campgrounds and concert area for a few hours.

30. Plaintiff walked to the concert area of the music festival to watch one musical act perform at about 3:00 p.m. on September 24, 2021.

31. After the performance finished, Plaintiff and her friend walked back to the Owner/Promoter Defendant campsite around 4:30 p.m.

32. It took Plaintiff and her friend about a half hour to walk back to the campsite. Once there, they rested for a while and then gathered items to return to the concert area around 6:00 p.m.

33. Rather than walking the entire distance back to the concert areas, which was over a mile, Plaintiff and her friend were directed to transportation offered by LNKBox, Axford, and FlexTram was solicited and paid $5.00 USD per person for a ticket price advertised on the

5

property for a ride by LNKBox, Axford, and/or FlexTram' motorized vehicle and trailer operated by Defendant Axford.

34. As Plaintiff and her friend entered the Defendants' Tram/Tractor Trailer, Plaintiff paid the LNKBox, Axford, and FlexTrams' attendants and agents who were working with or for the Defendants, $20.00 USD and the Defendants' attendant and agent provided Plaintiff monetary change for the purchase price for the commercial transportation. The Plaintiff was not provided a receipt.

35. After paying for the ride, Plaintiff stepped up on one of the middle Trailers pulled by the Tram/Tractor operated by Axford. Plaintiff and her friend chose seats provided by the Defendant facing forward toward the Tram/Tractor driver, Axford.

36. Plaintiff took her seat on the Tram/Trailer that was not equipped with warnings, seatbelts, or other safety or security restraint devices, and Axford started moving the vehicle up a hill on the premise.

37. Within seconds Plaintiff noticed that the Tram/Tractor/Trailers were moving up the hill on a dirt and gravel path at an unreasonably high speed for the conditions.

38. Within seconds, Axford approached the top of a hill while operating the Tram/trailers toward the concert area destination.

39. However, as the Tram/Tractor/trailers reached the top of the hill Axford attempted to change the course of the vehicle and proceed left to a campsite location rather than the concert area announced when the Plaintiff decided to accept the ride based upon this representation.

40. Axford then jerked the wheel counterclockwise to attempt the left turn down an embankment toward a campsite.

41. As Axford operated the Tram/Tractor/Trailers forward and toward the left, the Tram/Tractor/trailer Axford lost control of the vehicle that began to tip and roll up on to the wheels and tires on the driver/left side of the vehicle carrying the passengers and Plaintiff.

42. The Tram/Tractor/trailers continued to tip and became partially air born while still moving.

43. The Tram/Tractor/Trailers continued to roll, and the vehicle completely tipped over and on to its left side as Axford jumped from the Tram to safety to avoid injury.

44. As Axford jumped from the vehicle to avoid harm, the Tram/Tractor/Trailers, including Plaintiff, completely rolled toward its left driver side while bouncing uncontrollably while continuing to roll, shudder, and crash while the Plaintiff was inside the vehicle.

45. The Tram/Tractor/Trailers came to rest several feet from the moment Axford started to lose control of the vehicle when he attempted the abrupt left turn at an unreasonable speed for the unstable path conditions.

46. As the vehicle started to tip and roll the Plaintiff was thrown about the trailer causing her body to strike the vehicle metal body, sides, roof, seats, and/or floor ultimately ejecting and throwing the Plaintiff to the ground.

47. Upon coming to rest, the rolled over Tram/Tractor/Trailers landed on top of and pinned Plaintiff and her friend to the ground.

48. As Plaintiff was pinned under the Tram/Tractor/Trailers, she cried out to her friend for help.

49. Plaintiff's friend heard Plaintiff's calls but could not extricate himself from the Tram/Tractor/Trailers that was pinning him down as well.

7

50. After about a minute, a man approached Plaintiff and her friend and asked if they were okay.

51. Seeing that Plaintiff was physically injured, crying out in pain, and pinned beneath the Tram/Tractor/Trailers, the man called others over to help lift the Trailers off the Plaintiff.

52. Medical services arrived on scene about five minutes later to treat passengers on the flipped trailer, placed a brace on Plaintiff's neck, and moved her away from the gravel road to wait for further medical attention and transport.

53. About five minutes after that, Emergency Medical Technicians (EMTs) arrived in an ambulance and started to triage injured passengers, including Plaintiff.

54. EMTs informed Plaintiff's friend that Plaintiff was seriously injured from the rollover crash and needed to be life flighted to a hospital in Columbus, Ohio.

55. The EMTs asked Plaintiff a series of questions while Plaintiff writhed in pain waiting for the life flight helicopter with her friend. Plaintiff was in severe pain and told her friend that she was scared. Plaintiff then lost consciousness.

56. The EMTs then stabilized Plaintiff on gurney while monitoring her condition.

57. A second ambulance then arrived and transported Plaintiff to the landing area for the life flight helicopter on the Owner/Promoter grounds. Plaintiff's friend was not permitted to accompany Plaintiff in the ambulance, and the EMTs would not tell him where Plaintiff was being taken.

58. Plaintiff never regained consciousness at the scene.

59. Life flight flew Plaintiff to Grant Medical Center in Columbus, Ohio.

60. Once Plaintiff arrived, hospital personnel stabilized Plaintiff by, among other things, placing her on a ventilator and inserting a chest tube to address her collapsed lung injury caused from the rollover crash.

61. Plaintiff's friend could not locate Plaintiff for several hours because the hospital had misspelled Plaintiff's name. He finally was able to locate Plaintiff and arrived at the hospital around 4:00 a.m. on September 25, 2021.

62. When Plaintiff's friend arrived, Plaintiff was sedated and unconscious.

63. Around 7:00 a.m., Plaintiff regained consciousness for a short period of time before losing consciousness again.

64. The hospital moved Plaintiff to the Level 1 Trauma Unit that permitted only one visitor for the duration of Plaintiff's stay.

65. Plaintiff's mother arrived at the hospital from Kentucky at around 11:00 a.m. on September 25, 2021.

66. For the next almost three weeks, Plaintiff remained at Grant Medical Center undergoing lifesaving treatment including surgery.

67. After about five days, Plaintiff was moved from the emergency trauma unit to the ICU.

68. After about a week, hospital personnel removed Plaintiff's chest tube and discovered an abscess.

69. Hospital personnel then discovered that Plaintiff had contracted pneumonia and MRSA caused by LNKBox, Axford, and FlexTram's actions and omissions secondary to Plaintiff's rollover injuries and treatment.

70. As a direct and proximate result of the Defendants LNKBox, Axford, and FlexTram's individual and collective negligent and malicious acts and omissions, Plaintiff sustained injury to her person requiring medical treatment and incurred medical expenses in the past, and she will continue to require medical treatment and incur medical expenses into the future.

71. As a direct and proximate result of the Defendants LNKBox, Axford, and FlexTram's individual and collective negligent and malicious acts and omissions, Plaintiff has suffered mental anguish, pain and suffering, and emotional distress, and will continue to suffer mental anguish, pain and suffering, and emotional distress into the future.

72. As a direct and proximate result of Defendants LNKBox, Axford, and FlexTram's individual and collective negligent and malicious acts and omissions, Plaintiff has incurred undetermined miscellaneous expenses and expects to incur miscellaneous expenses into the future.

73. As a direct and proximate result of Defendants LNKBox, Axford, and FlexTram's individual and collective negligent and malicious acts and omissions, Plaintiff has suffered lost wages and her earning capacity has been permanently impaired.

74. As a direct and proximate result of Defendants LNKBox, Axford, and FlexTram's individual and collective negligent and malicious acts and omissions, Plaintiff suffered and continues to suffer permanent and substantial physical deformities and disabling physical and psychological injuries, including but not limited to, two broken shoulder blades, a broken left clavicle, multiple broken ribs on the right and left side, a broken tailbone, multiple spine and pelvic fractures, a punctured lung, multiple cuts and lacerations, traumatic brain damage, eye

injury, pneumonia caused by treatment of injuries caused by the crash, MRSA, and injuries to both hands and arms leaving her partially paralyzed.

75. Plaintiff spent the next ten days in the hospital being treated for her injuries and sepsis.

76. During that time, Plaintiff was rendered so weak and paralyzed by her injuries that she could not use her hands or arms, preventing her from lifting herself, writing, bathing, or feeding herself that continues by degree to this day.

77. After seventeen days in the hospital, Plaintiff was released by the hospital to return home to Kentucky with her mother by car.

78. Plaintiff had previously sold her condominium in Louisville, Kentucky to rent an apartment in Memphis, Tennessee as required for her employment with the Cheesecake Factory.

79. Upon arriving in Kentucky, Plaintiff was forced to move into her mother's house so that her mother could provide care for her due to her disabling condition.

80. Plaintiff spent the next months at her mother's house being cared for by her mother and friend and routinely being taken to the hospital and medical facilities for treatment.

81. After several months at her mother's home, Plaintiff was able to secure her own apartment with the nursing assistance of her family and friend where she continues to treat awaiting more surgery in an effort to alleviate her paralysis.

82. Plaintiff has continued to routinely treat with various medical providers for therapy and evaluation, including daily visits to receive daily injections to treat MRSA and physical and occupational therapy.

83. Plaintiff is scheduled to have additional surgery once it is determined the MRSA is dormant.

84. Plaintiff continues to struggle to use her hands and remains partially paralyzed.

85. Before suffering the injury from the rollover crash, Plaintiff was promoted by her employer, The Cheesecake Factory, and was scheduled to be transferred to Memphis, Tennessee. Her first day of work was to be October 13, 2021, but the Plaintiff was unable to work due to her disabling injuries.

86. Because of her debilitating and permanent injuries, Plaintiff has remained in Louisville Ky. and is unable to work full time for an extended period of time and then in a limited capacity different than the assigned position she held before the crash.

87. Plaintiff was forced to cancel the lease in Memphis and her Cheesecake Factory job she was originally assigned was assigned to another person.

88. Plaintiff is still unable to work or use her hand as a result of her injuries and continues treatment for MRSA and future surgeries in an effort to regain feeling and use of her hands. The Plaintiff suffers from permanent and disabling injuries.

89. At all times relevant to the facts stated, Defendants LNKBox, Axford, and FlexTram collectively agreed or otherwise contracted to advertise, promote, and offer transportation to the Plaintiff for a fee on the commercial vehicle that resulted in her damages and losses.

**FIRST CAUSE OF ACTION**
*Plaintiff's Personal Injury Claim Against Axford*

90. All facts and allegations are incorporated into this cause of action by reference.

91. Axford had a duty to exercise the reasonable degree of care for the safety of his passengers while operating the commercial vehicle.

92. On September 24, 2021, Axford was incompetent and inexperienced in the reasonable and safe operation of the Tram and his actions demonstrate a conscious disregard for the rights and safety of Plaintiff, the Tram passengers and motoring public, while acting with indifference to the consequences to others despite being aware of his conduct and knowing there was a great probability of causing substantial harm including personal injuries and was therefore negligent and/or malicious in the operation of the LNKBox Tram vehicle while in the course and scope of his employment with Defendants LNKBox and as an agent, assign, or contractor for the FlexTram.

93. Axford's (and LNKBox, and FlexTram,) individual and collective negligence and malice were a direct and proximate cause of Plaintiff's economic and noneconomic losses including her permanent and substantial physical deformities and disabling physical and psychological injuries, treatment, lost wages and earning capacity impairment as stated herein.

**SECOND CAUSE OF ACTION**
*Vicarious Liability/Respondeat Superior of Defendant LNKBox*

94. All facts and allegations are incorporated into this cause of action by reference.

95. At all relevant times, Axford was acting in the course and scope of his employment as, an employee, agent, servant, or independent contractor for Defendant LNKBox.

96. Accordingly, Defendant LNKBox is vicariously liable, including respondeat superior, for the negligent and malicious acts of Axford described in the statement of facts, above.

**THIRD CAUSE OF ACTION**
*Negligence/recklessness of Defendant LNKBox*

97. All facts and allegations above are incorporated into this cause of action by reference.

98. LNKBox had a duty to act reasonably in hiring, instructing, training, supervising, and retaining its drivers and other employees and agents, including Defendant Axford, and to promulgate and enforce policies, procedures, and rules to ensure that its drivers and vehicles operated were reasonably safe for the passengers on the Tram including the Plaintiff.

99. LNKBox had a duty to exercise reasonable care in entrusting its vehicles and equipment to responsible, competent, and qualified drivers.

100. Axford was not qualified, was otherwise inexperienced and incompetent to operate the vehicles including the Tram/Tractor/Trailers.

101. LNKBox breach its duties owed the Plaintiff and was therefore negligent, malicious, and reckless.

102. LNKBox's negligence, malice, and recklessness was a direct and proximate cause of Plaintiff's injuries and the damages described in this Complaint.

## FOURTH CAUSE OF ACTION
*Vicarious Liability of Defendant FlexTram*

103. All facts and allegations are incorporated into this cause of action by reference.

104. Upon information and belief, at all relevant times, Axford was acting in the course and scope of his employment as, an employee, agent, servant, or independent contractor for FlexTram. Accordingly, Defendant FlexTram is vicariously liable for the negligent and malicious acts of Axford described in the statement of facts, above.

## FIFTH CAUSE OF ACTION
*Negligence/recklessness of Defendants*

105. All facts and allegations are incorporated into this cause of action by reference.

106. FlexTram had a duty to act reasonably in hiring, instructing, training, supervising, contracting, and retaining its drivers and other employees and agents, including Axford, and to promulgate and enforce policies, procedures, and rules to ensure that its drivers and vehicles were reasonably safe.

107. FlexTram had a duty to exercise reasonable care in entrusting its vehicles and equipment to responsible, competent, and qualified drivers.

108. FlexTram breached this duty and was therefore negligent and reckless.

109. FlexTram's negligence and recklessness was a direct and proximate cause of Plaintiff's injuries and the damages described in this Complaint.

**SIXTH CAUSE OF ACTION**
*Claim for Punitive Damages against Defendants*

110. All facts and allegations are incorporated into this cause of action by reference.

111. LNKBox, Axford, and FlexTram act and omission demonstrated a conscious disregard for the rights and safety of the Plaintiff and others despite being aware of their conduct and knowing there was a great probability of causing substantial harm resulting in Plaintiff's injuries and damages.

112. Accordingly, Plaintiff demands punitive damages against Defendants.

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

(I)    Under the First Cause of Action, Plaintiff demands judgment against Defendant Axford for personal injury in excess of $75,000.00 compensatory damages, along with interest, attorney fees and the costs of this action;

(II)   Under the Second Cause of Action, Plaintiff demands judgment against Defendant LNKBox for vicarious liability in an amount in excess of $75,000.00, compensatory damages, along with interest, attorney fees and the costs of this action;

(III) Under the Third Cause of Action, Plaintiff demands judgment against Defendant LNKBox for negligence/recklessness in an amount in excess of $75,000.00 compensatory damages, punitive damages, along with interest, attorney fees and the costs of this action;

(IV) Under the Fourth Cause of Action, Plaintiff demands judgment against Defendant FlexTram for vicarious liability in an amount in excess of $75,000.00 compensatory damages, along with interest, attorney fees and the costs of this action;

(V) Under the Fifth Cause of Action, Plaintiff demands judgment against Defendant FlexTram for negligence/recklessness in an amount in excess of $75,000.00 compensatory damages, punitive damages, along with interest, attorney fees and the costs of this action;

(VI) Under the Sixth Cause of Action, Plaintiff demands judgment against Defendants LNKBox, Axford, and FlexTram for punitive damages/recklessness in an amount in excess of $75,000.00, punitive damages, along with interest, attorney fees, and the costs of this action;

(VII) Interest, attorney fees and the costs of this action; and

(VIII) Any other relief in law or equity the Court deems appropriate.

Respectfully submitted,

*/s/ Scott E. Smith*
Scott E. Smith (0003749)
**Scott Elliot Smith, L.P.A.**
5003 Horizons Drive, Suite 101
Columbus, OH  43220
Telephone: (614) 846-1700
Facsimile: (614) 486-4987
Email: ses@sestriallaw.com
*Attorney for Plaintiff*

## **DEMAND FOR JURY TRIAL**

The undersigned Attorney for Plaintiffs hereby demands a trial by jury on any and all triable issues, such demand being made pursuant to Rule 38 of the Federal Rules of Civil Procedure.

.

                                      */s/ Scott E. Smith*
                                      Scott E. Smith (0003749)