**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Brooke N. Mann,

        Plaintiff,

    v.

LNKBox Group, Inc. *et al.*,

        Defendants.

Case No. 2:22-cv-2553
District Judge James L. Graham
Magistrate Judge Elizabeth P. Deavers

<u>Opinion and Order</u>

Plaintiff Brooke Mann suffered serious injuries at a music festival in September 2021 when a shuttle tram on which she was riding tipped over on a sloped roadway.  Plaintiff sued six defendants whom she alleges are responsible for the accident under Ohio's legal standards governing negligence. This Court has diversity jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1332.  The matter is before the Court on motions for summary judgment filed by two of the defendants: Apex Event Management, LLC and Trickle Productions, LLC.  For the reasons stated below, the motions for summary judgment are granted in part and denied in part..

**I.      Background**

    **A.      Festival Overview**

The Lost Lands Music Festival takes place each September at Legend Valley, a large outdoor venue near Buckeye Lake and Thornville, Ohio.  The multi-day festival is dinosaur-themed and features electronic dance music.  About 30,000 people attended the festival in 2021.  *See* Trickle Dep. (Doc. 133-1) at 52-53.

Defendant Apex Event Management LLC is a Delaware company with its principle place of business in California.  It promoted the festival in 2021, as it had previously.  *See* Abel Dep., Vol. I (Doc. 142-1) at 38, 58.  In its role as "promoter" and "event operator," Apex presented the festival and was the entity ultimately responsible for ensuring that it took place.  *Id.* at 48-49, 129, 133; Trickle Dep. at 47, 69.  To present the festival, Apex contracted with other entities and individuals to acquire the necessary rights, to book talent, to market and sell tickets, and to obtain the goods and services needed for putting on the festival.

1

Apex acquired the right to use Legend Valley through defendant Trickle Productions LLC, an Ohio business.  The sole member of Trickle Productions is Steve Trickle, whose 70-acre farm constitutes the core of the festival grounds.  *See* Trickle Dep at 27.  As the festival grew in size over the years, Trickle acquired leases on additional land from neighboring owners.  *Id.* at 17, 27-28, 46.  In 2019, Trickle and Apex entered into a Venue Lease Agreement that they renewed, with modifications, for 2021.  *See* Doc. 133-3.

For the 2021 festival, Trickle held rights to 300 acres of land and leased it to Apex.  *See* Trickle Dep. at 30.  The land leased to Apex for Lost Lands consisted of cleared farm land and some wooded areas.  *See id.* at 26-27.  During the festival, the land is used for concert stages, merchandise and concession vendors, camping, parking, and so forth.  *See* Doc. 142-3 at PAGEID 3724; Doc. 133-3 at PAGEID 2697-2707.

Roadways, both paved and unpaved, provided access to the various areas of the festival grounds.  *See id.*; Trickle Dep. at 146.  The roads within the grounds were used by festival staff (primarily using golf carts), shuttle trams (described in detail below), patrons (arriving in their private vehicles to park and camp), law enforcement, and medical and emergency personnel.  *See, e.g.*, Doc. 142-3 at PAGEID 3729-3730; Abel Dep., Vol. I at 115-16.

### B.      The Roles of the Other Defendants

Apex contracted with defendant AEG Presents LLC (formerly known as Madison House Presents LLC), a California business, to produce the Lost Lands festival.  Under a services agreement, Madison House agreed to manage and oversee the various third-party vendors who were contracted to help put on the festival.  *See* Doc. 142-13 at PAGEID 3818.  Madison House had a site operations team which worked directly with vendors, and their operations concerned virtually all aspects of the festival, including stage production, sponsorship, concessions, waste management, traffic and parking, security, emergency planning, and more.  *See id.* at PAGEID 3826-31.

Apex contracted with defendant LNKBox Group, Inc., a California corporation, to provide transportation services at the festival.  LNKBox agreed to provide ten trams for patron transportation and four trams for staff use.[1]  *See* Doc. 106-2 at PAGEID 1322.  LNKBox also provided tram staff and agreed that the staff would perform services in compliance with best practices and in a manner to

---

[1] The written contract on the record is not signed.  *See* Doc. 106-2 at PAGEID 1322.  Brett Abel of Apex testified that the parties never signed the contract, but they proceeded with performance as though the terms of the unsigned contract controlled.  *See* Abel Dep., Vol. 1 at 206-07.  *Accord* Bradley Dep. (Doc. 106-1) at 30-31 (testifying on behalf of LNKBox that the terms of the written contract reflected the agreement the parties had in place).

protect the health and safety of themselves and the public. *See id.* at PAGEID 1325. LNKBox had an obligation under the parties' agreement to provide equipment that was fit for use and to ensure that employees had proper training. *See* Bradley Dep. at 52-53.

LNKBox rented tram trailers from defendant FlexTram, LLC, a Georgia business. The trailer unit used at the 2021 Lost Lands festival was approximately eleven feet long and just over four feet wide. *See* Doc. 134-5 at PAGEID 2899. Each trailer had four benches for seating, with a total capacity of eight passengers (two people per bench). *Id.* The benches did not have seatbelts. *See* Bradley Dep. at 194. The bottom of the trailer sat just over a foot above the ground, and a canopy over the seats was about six-and-a-half feet above the ground. *See* Doc. 134-5 at PAGEID 2899. The record contains the following technical drawing of the trailer unit:



*Id.* at PAGEID 2900.

The trailers were designed to be hitched and pulled by a tow tractor, with up to two trailers per tractor. *See* Doc. 134-7 at PAGEID 2918. In this configuration, the tram would look as follows:



*Id.* The trailers did not have their own braking system. *See* Bradley Dep. at 86. They had independent axles with wheels that could turn as the tow vehicle turned. *See id.* at 156.

LNKBox rented Yanmar tractors from Holmes Rental Station, Inc. (a non-party) in Sugarcreek, Ohio. *See* Doc. 106-2 at PAGEID 1277. The tractor involved in the accident at issue was a Yanmar YT359 tractor, which had 58.9 horsepower and a top speed of 18 miles per hour. *See* Bradley Dep. at 78; Doc. 186-2 at PAGEID 5570. The tractor had an accelerator and a brake operated by foot pedals and a throttle operated by a hand lever. *See* Bradley Dep. at 78-79. The following is an example image of a Yanmar YT359:



Doc. 186-2 at PAGEID 5570. The Yanmar YT359 involved in the accident was pulling two trailers. *See* Bradley Dep. at 48.

LNKBox hired drivers to operate the trams. Defendant Ryan Axford, a California resident, operated the tram which was involved in the accident at issue. *Id.*; *see also* Doc. 106-2 at PAGEID 1278-1282. Axford arrived early for the festival, on Tuesday, September 21, 2021, to receive training over the span of a couple of days. *See* Bradley Dep. at 106. He first received training for an hour or two on operating the tractor itself. *See* Axford Dep. (Doc. 105-1) at 38-39, 42-43, 50. Axford was given an operator's handbook, which he read. *See id.* at 62-63; *see also* Doc. 106-2 at PAGEID 1283-1293. He spent a couple of hours driving the tractor on the terrain of the festival grounds, including the pathways on which he would be transporting patrons. *See* Axford Dep. at 51-52. Axford then practiced towing a trailer and drove several laps around a large parking lot. *See id.* at 52-56. He practiced driving the tractor with one trailer (likely empty) on the particular path where the accident later happened. *See id.* at 56-57. Axford was instructed by his trainers not to exceed five miles per hour while driving the tram. *See id.* at 74.

### C.  Plaintiff Brooke Mann

Brooke Mann is a Kentucky resident. She purchased tickets in advance for the 2021 Lost Lands Music Festival. *See* Mann Decl. (Doc. 144-4), ¶ 2. She had attended the festival once before, in 2018. *See* Mann Dep. (Doc. 144) at 57–58.

4

The 2021 festival took place from Friday, September 24 through Sunday, September 26.  Mann and a friend drove to Legend Valley on Thursday, September 23 and had planned to set up a tent in the campground area.  *See id.* at 55–56.  But rainfall on Thursday caused a closure of the campground and, when combined with heavy vehicular traffic arriving for the festival, it meant that Mann and her friend would have to spend the night at their car.  *See id.* at 56; *see also* Doc. 142-15 (email reflecting the closing of the campgrounds due to wet conditions).  They set up their tent on Friday morning, between 6:00 a.m. and 8:00 a.m.  *See* Mann Dep. at 58.

**D.      The Accident**

Mann and her friend walked from the campground to the concert area to attend the festival during the day on Friday, September 24.  *See id.* at 62.  They walked back to the campground later in the day to get their jackets before the evening shows began.  It was about 6:30 p.m., and they noticed a tram taking people back to the concert area.  They each paid $5 for a ride.  *See id.* at 64.

Mann and her friend boarded the tram at a stop as it made its way around the campground where she and her friend had parked and set up a tent.  *See* Mann Dep. at 63.  The first trailer appeared to be full, and Mann and her friend boarded the back, or second, trailer.  *See id.* at 60, 64.  They sat on a forward-facing bench.  *See id.* at 60.  Mann does not recall on which side (right or left) of the trailer she sat.  *See id.* at 65.  According to a police report, there were a total of 15 people on the tram: Mann; 12 other patrons; the operator, Axford; and another employee, called a "loader," who sold tickets and helped patrons board and dismount the tram.  *See* Axford Dep. at 77; Doc. 105-2 at PAGEID 1034; Doc. 174-1 at PAGEID 5202.

Once the tram picked up Mann and her friend, it progressed up a hill.  Mann recalls that Axford accelerated in order to get up the hill.  *See* Mann Dep. at 66.  The pathway was made of dirt with loose gravel.  *See* Doc. 174-1 at PAGEID 5201; Doc. 186-2 at PAGEID 5567.  It had rained on previous days, and there is conflicting testimony about whether the road surface was wet or dry at the time of the accident.  *Compare* Mann Dep. at 68 (stating that the surface was "a little muddy") *with* Axford Dep. at 159 (testifying that it was dry).

As the tram reached the top of the hill, there was a fork in the roadway and Axford turned to the left.  In the record is the following aerial image of the tram route and accident location, but the Court advises that the notation on the left side of the image in white lettering that the vehicle "stopped" at the top of the hill before turning left is not necessarily an established fact, *see* Axford Dep. at 91 (testifying that he "slowed down" at the top of the hill as a couple of people walked by):

5



Doc. 105-2 at PAGEID 1051 (markings provided by the parties; north is the top of the photo). Another aerial image provides a close-up view of the tram's path and crash location:



Doc. 186-1 at PAGEID 5555 (markings provided by plaintiff's expert witness; north is again the top of the photo).

The Court has relatively little non-expert evidence about what happened once the tram turned left at the top the hill. Mann believes that the accident took place about 30 seconds after they boarded. *See* Mann Dep. at 64. But she does not have a memory of how the accident happened. She simply

remembers her friend saying to "hold on" and then her head "hitting something very, very hard," at which point she lost consciousness.  *Id.* at 64-65.

Despite there being 12 other patrons and the employee "loader" on board the tram, the record currently does not contain any testimony or statements from them.

A traffic crash report, completed by Licking County Sheriff's Deputy Nicholas Shuster, does not contain witness statements.  *See* Doc. 174-1 at PAGEID 5201-5207.  The report indicates that the accident occurred at 6:38 p.m., while there was still daylight, and that the weather was clear.  *See id.* at PAGEID 5201.  The report also contains a narrative, written by Deputy Shuster, stating that the tram traveled "on a gravel road over a hill."  *Id.*  The road then had a "downward grade with a right curve heading north."  *Id.*  The operator of the tram "failed to maintain control" and the trailers "fish tailed."  *Id.*  The tractor "began to tip" on its side, with the trailers tipping as well.  *Id.*  The tractor ended up on its left side, the first trailer flipped over and landed on its top, and the second trailer detached and landed on its left side.  *Id.* at PAGEID 5201-5202, 5233.

The Sheriff's Department captured and collected photographs of the accident scene.  *See* Shuster Dep. (Doc. 174-17) at 44-45; Docs. 174-5 to Doc. 174-16.  Below are select photos of the scene:



Doc. 174-5 at PAGEID 5233 (facing back up the hill, opposite the direction of travel).

7



Doc. 174-15 at PAGEID 5247 (facing down the hill, with the direction of travel).



Doc. 174-5 at PAGEID 5229 (looking at the rear of the second trailer).



Doc. 174-5 at PAGEID 5225 (looking back up the hill which the tram had crested).

Sheriff's deputies who had responded to the scene reached a preliminary conclusion – based on talking to witnesses and investigating the scene – that Axford failed to maintain control of the tram. *See* Doc. 174-1 at PAGEID 5201; Shuster Dep. at 66.  They believed, based on tire marks, that once the tram had crested the hill and was turning left to go downward, the tractor initially went too far right, with its right-hand tires going off the gravel road and making contact with the inner embankment. *See id.* at 40-41, 48.  They believed that hitting the embankment caused the tractor to tip and that the trailers in turn fish-tailed and tipped. *See id.* at 41, 48.  They also believed that speed played a factor, as the tractor's throttle was set to "rabbit mode," which allowed it to travel at higher speeds. *See id.* at 41, 48, 52, 54.  Finally, they noted that the trailers had relatively narrow wheelbases, making them more susceptible to tipping. *See id.* at 41.  The deputies did not find any evidence to support a belief that Axford was impaired while operating the tractor. *See id.* at 31-36.

When asked about how the accident occurred, Axford testified in his deposition: "I don't -- genuinely don't understand how the crash happened." Axford Dep. at 90.  He accelerated the tractor to get up the hill, knowing that the trailers were largely full. *See id.* at 101-02.  Axford denies that he had the throttle in the rabbit position. *See id.* at 114.  Once he reached the top of the hill and began going downhill, he felt a tug or pull to the left from the trailers. *See id.* at 90-91, 103.  He had not previously felt a tug like that one while driving the tram for about six hours on that day. *See id.* at 106, 148.

9

Axford responded to feeling the tug from the trailers by accelerating.  *See id.* at 91 ("As I was going down the hill, I feel a tug behind me, and I accelerate."), 105-106.  He testified that the tractor tires did not go off of the gravel road.  *See id.* at 112-13.  He does not know if the trailers fish-tailed, as he did not look behind him.  *See id.* at 89.  He believes that the trailers, not the tractor, tipped over first.  *See id.* at 113.  According to Axford, everything happened quickly, and, "[The] next thing I know I'm – the tractor's tipping over and I have to jump or else the tractor's going to land on my legs and break my legs."  *Id.* at 91.  Axford does not know how fast the tractor was travelling as it went down the hill.  *See id.* at 127-28.  He did not apply the brake while going down the hill.  *See id.* at 127.

After jumping from the tractor, Axford looked around and saw individuals who had been injured by the accident.  *See id.* at 151-52 (testifying to seeing people with cuts and bleeding and people lying on the ground in pain).     Soon thereafter, medics and other personnel responded to the scene.  *See id.* at 152 (testifying to seeing more than ten emergency personnel).

At some point in the sequence of events, Mann was ejected from her seat on the trailer.[2]  She was found by emergency personnel to be unconscious and was life-flighted to a hospital in Columbus.  *See* Doc. 174-1 at PAGEID 5204; Doc. 174-2 at PAGEID 5208; Shuster Dep. at 29-31.

Although plaintiff's injuries are not at issue in the pending motions for summary judgment, it appears to be undisputed Mann suffered significant injuries from the accident.  The Amended Complaint alleges that Mann's body struck the metal components of the trailer during the accident and that she, once thrown onto the ground, was pinned underneath one of the trailers.  *See* Am. Compl. (Doc. 30) at ¶¶ 63, 66.  The Amended Complaint further alleges that Mann remained at the hospital in the trauma and intensive care units for 17 days and that she sustained the following injuries: "the loss of use of her left upper limb (arm), two broken shoulder blades, a broken left clavicle, multiple broken ribs on the right and left side, a broken tailbone, multiple spine and pelvic fractures, a punctured lung, multiple cuts and lacerations, traumatic brain damage, eye injury, pneumonia caused by treatment of injuries caused by the crash, MRSA, and injuries to both hands and arms leaving her partially paralyzed."  *Id.* at ¶¶ 91, 110; *accord* Mann Decl., ¶ 4.

### E.     More about the Roadway

The gravel road where the accident occurred was created in 2019.  Apex, with Trickle's and Madison House's input, decided to add a dedicated roadway to connect two pre-existing farm roads

---

[2] There is no evidence in the record to suggest that Mann was not seated.  *See* Axford Dep. at 102 (stating that he does not recall any passengers on the tram standing).

and thereby improve ingress and egress.  *See* Abel Dep., Vol. I at 151-52.  Trickle obtained the landowner's permission to do so.  *See* Trickle Dep. at 42.

Apex contracted with third-party defendant Zemba Bros., Inc. (against whom Apex has filed a third-party complaint in this case) to perform the work.  Zemba is an Ohio business which provides private road construction and repair.  *See* Paisley Dep. (Doc. 132-1) at 33.  There was already some pathway in existence where the road was placed.  *See id.* at 40 (testifying that the strip of land was used to haul hay).  Zemba did not choose where to place the road, but followed Apex's instruction.  *See id.* at 60, 65 (testifying that Apex "staked out where they wanted a road").

From the record, it seems unlikely that Zemba needed to remove or cut grass and topsoil to create the road, but they would have done so if the existing path were not already stripped of grass and topsoil.  *See id.* at 40, 60-61, 67.  Zemba would also have dug out any soft spots in the ground and filled them in with stone.  *See id.* at 62.  At the very least, it is certain that Zemba spread a layer of crushed limestone to create the road.  *See id.* at 65-69 (testifying to the sizes of limestone typically used and to the depths of the layers).  Once Zemba placed down the stone, which has also been referred to as gravel, it ran a rolling machine over top to compact the stone layer. [3]  *See id.* at 68-69.

Based on the photographs of the accident scene, Zemba's representative testified during his deposition that it appeared that the gravel which had been placed on the road was largely gone by the time of the accident.  *See id.* at 49-50.  Some gravel was to the side of the road, which he attributed to vehicular traffic, combined with the slope of the road, pushing the gravel to the side.  *See id.*; *see also* Doc. 132-12 (photos of the accident scene).

There had been rain on the days leading up to the 2021 festival.  *See* Cheek Dep. (Doc. 97) at 71-72; Miller Dep. at 86-87; Sampliner Dep. at 58.  Madison House's site operations team added wood chips and gravel to try to dry out and repair the grounds.  *See id.*  But it is unclear whether or not wood chips and/or gravel were placed on or near the road where the accident occurred.  *See id.* at 71-72, 77; *see also* Paisley Dep. at 110.

The condition and nature of the road have been the subject of expert discovery and will be discussed further in Part V.C.2.a below.  Plaintiff's expert, James Crawford, is a forensic engineer and accident reconstructionist.  According to his August 11, 2024 report, the left-hand turn which Axford

---

[3] It is unclear whether the road was created prior to the September 2019 festival.  Zemba's invoice to Apex for the work, plus several additional projects, shows that work on all of the projects was performed from August 27, 2019 to October 7, 2019.  *See* Doc. 132-9 at PAGEID 2432-2433.  Deposition testimony generally refers to the road being created in 2019.  *See*, *e.g.*, Paisley Dep. at 62; Abel Dep., Vol. I at 249-50.  *See also* Miller Dep. (Doc. 164-1) at 65; Sampliner Dep. (Doc. 165) at 18.

made (as he reached the top of the hill) was "sharp," being between 105 and 120 degrees. Doc. 186-2 at PAGEID 5575. The hill then had a "steep" downgrade of between 21 and 25 percent.[4] *See id.* at PAGEID 5573. The ensuing right-hand curve (starting in the downhill section) was between 70 and 90 degrees. *See id.* at PAGEID 5575. Crawford found that the downhill section of the road had a cross-slope which tilted down towards Axford's left side as he drove down the hill. Crawford measured the cross-slope at different spots to be between 11 and 13 percent. *See id.* at PAGIED 5575.

### F. Plaintiff's Claims against the Moving Defendants

Plaintiff has brought negligence claims against each of the defendants. Regarding Apex, she alleges that it breached a duty to provide a reasonably safe event to invitees. She further asserts a claim for negligent retention and alleges that Apex breached a duty to exercise ordinary care in hiring, training, supervising, and retaining employees and agents who worked at the 2021 Lost Lands festival. Plaintiff repeats these same claims against Trickle.

In addition to the pending motions for summary judgment filed by Apex and Trickle, several defendants have moved to strike the December 12, 2024 expert report of James Crawford. The motion to strike will be addressed below.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect

---

[4] As will be addressed in Section III.B below (discussing defendants' motion to strike Crawford's December 12, 2024 report), there is reason to believe that the profile of the hill could have been altered by Zemba in 2022. Crawford's measurements and calculations concerning the hill may, or may not, accurately reflect the condition of the hill at the time of the accident.

the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## III. Motion to Strike

### A. Introduction

The parties have presented a threshold issue of whether one of plaintiff's expert reports should be excluded from consideration at the motion for summary judgment stage and later at trial.

Plaintiff's expert, James Crawford, has issued three separate reports. The first two reports are not at issue in the motion to strike. The First Report is dated November 6, 2023. *See* Doc. 186-1. The Second Report is dated August 11, 2024. *See* Doc. 186-2. As explained by plaintiff, the Second Report became necessary after a site visit of the accident scene by the party's experts on May 16, 2024.

Apex and Trickle, as well as AEG and Zemba, have moved to strike the Third Report, dated December 12, 2024. Defendants first received the Third Report on December 27, 2024. *See* Doc. 181-1. Defendants contend that plaintiff improperly produced the Third Report after the Court's August 26, 2024 deadline for the production of primary expert reports and even after the October 26, 2024 deadline for fact discovery. *See* June 5, 2024 Order (Doc. 121). The parties were specifically cautioned that no further extensions of those deadlines would be granted. *See id.*

13

Two rules are implicated by plaintiff's late disclosure of Crawford's Third Report.  First, Federal Rule of Civil Procedure 26(a) requires that parties disclose the reports of their expert witnesses "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  "District courts have broad discretion to exclude untimely disclosed expert-witness testimony."  *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).  A court may exclude information that is not timely disclosed as required by Rule 26(a) "unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *accord Vaughn v. City of Lebanon*, 18 F. App'x 252, 263 (6th Cir. 2001).

Second, the parties have a duty to supplement their disclosures if a disclosure is later found to be "incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A).  The duty to supplement extends to expert reports, *see* Fed. R. Civ. P. 26(e)(2), and it exists apart from the deadlines which otherwise would apply. *See Am. Mun. Power, Inc. v. Voith Hydro, Inc.*, No. 2:17-cv-708, 2021 WL 9964417, at *4 (S.D. Ohio May 18, 2021) ("If AMP's Amended Report is a required supplement under Rule 26(e), this Court need not consider whether it was substantially justified or what harm it may cause to Voith because it would not be subject to exclusion under the Federal Rules of Civil Procedure.").

**B.** **Whether the Third Report Qualifies as a Supplemental Disclosure**

Crawford's Third Report is presented as a complete, stand-alone report.  Even so, plaintiff characterizes it as a supplemental disclosure under Rule 26(e)(2).  She argues that disclosure of the Third Report was required because of new information she learned after Crawford prepared his Second Report.  Plaintiff contends that when her counsel deposed Zemba's corporate representative, Bryan Paisley, on September 19, 2024, "[f]or the first time, it was disclosed that the crash scene road had been altered by the contractor in 2022 following Plaintiff Mann's 2021 accident."  Doc. 186 at PAGEID 5537.  Plaintiff argues that Crawford needed to supplement his August 11, 2024 Second Report in light of the revelation made on September 19, 2024 that the road had been altered after the accident.  Plaintiff states that Crawford "was able to conduct further inquiry" before issuing the December 12, 2024 Third Report.  Doc. 186 at PAGEID 5538.

As an initial matter, the Court agrees with plaintiff that Paisley did testify to post-accident changes to the road.  In 2022, Apex and/or Trickle hired Zemba to perform various improvements on the festival grounds.  *See* Doc. 132-4 at PAGEID 1776-1794.  In the course of performing the work, Zemba of its own accord reconfigured the accident road by adding a short new section of gravel road immediately east of, and running alongside the section where the accident occurred.  *See* Paisley Dep. at 86-88, 137-38.  Zemba decided to "cut in" in this new path so that it was easier for its dump trucks to use the road.  *Id.* at 89.  The new section "[t]ook the curve out" of the old road and made it

14

more level.  *Id.* at 88.  The new section is slightly higher up the hill than the spot where the accident took place.  *See id.* at 124 (stating that the new path is "above" the crash scene).  Paisley testified that in creating the new path, Zemba's crew moved dirt on top of the section of road where the accident happened.  *See id.* at 91, 142.  The section where the accident occurred is now at least partially covered by grass.  *See id.* at 143.

Defendants dispute whether the Paisley deposition revealed new information. Supplementation is limited to "correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure."  *Antioch Co. Litig. Trust v. McDermott Will & Emery, LLP*, No. 3:09-cv-218, 2016 WL 8257680, at *2 (S.D. Ohio July 15, 2016).  Thus, a party "will not be permitted to 'supplement' [an expert] report to present a change of opinion based on information known at the time of the previously-submitted report."  *Winter Enters., LLC v. W. Bend Mut. Ins. Co.*, No. 1:17-CV-360, 2019 WL 3413907, at *8 (S.D. Ohio July 29, 2019).

Upon review of the materials cited by the parties, the Court concludes that plaintiff's counsel first became aware of the 2022 changes to the accident-scene road well before the Paisley deposition. After the site visit took place in May 2024, counsel for plaintiff sent an email, dated June 7, 2024, to opposing counsel.  The subject line of the email was "Brooke Mann – Trailer Inspection – Property Inspection – Spoliation."  Doc. 188-1 at PAGEID 5627.  The email contained four sentences, the first of which concerned the alleged deconstruction of the tram trailers without plaintiff's knowledge.  The second sentence stated, "We also learned for the first time the scene was changed without notice by Apex when we conducted our site visit – spoliation."  *Id.*  The next sentence reiterated that the changes to the accident scene and to the trailers occurred without notice to plaintiff.  *See id.*  The email ended with a sentence asking for an explanation.  *See id.*

That plaintiff knew of the changes to the road prior to the Paisley deposition on September 19, 2024 is confirmed by Crawford's Second Report, dated August 11, 2024.  After describing the curve angles, downgrade, and cross-slope of the accident road, Crawford addressed the fact that the road had been reconfigured:

> An alternate path was created after this crash that eliminated the extreme slope, S-turns, and extreme super-elevation that existed on the original path.  The following images were included to illustrate the safer alternate path.



**Introtech images illustrating the alternate path created after this crash.**

> In my opinion, property owners and/or event personnel should have insisted on executing the creation of this safer alternate path before the event started if they intended for their FlexTram people movers to safely transport patrons from the top of the hillcrest directly to campsites below.

Doc. 186-2 at PAGEID 5576.

Finally, plaintiff served interrogatories on Zemba in advance of the Paisley deposition. Several interrogatories expressly referred to the changes made to "the crash scene road **after** September 24, 2021." Doc. 132-8 at PAGEID 2399-2401 (emphasis in original). Indeed, the deposition questions asked by plaintiff's counsel on the matter show he already knew that changes had been made to the road.[5] *See* Paisley Dep. at 85 (referring to the interrogatories and asking Paisley if he participated in the "reconfiguration of the crash scene road").

Arguably, Paisley's deposition did reveal a new fact – that in the course of creating the reconfigured section, Zemba placed dirt on top of the section of the road where the accident occurred. Had Crawford's Third Report incorporated additional material to address that possibly new fact, then the Court would be inclined to agree with plaintiff's characterization of the Third Report as a supplemental disclosure. However, the Third Report does not even acknowledge, let alone discuss, the fact that dirt had been placed on top of the section of road where the accident occurred. Despite plaintiff's claim that Crawford conducted further inquiry after Paisley's deposition, there is no mention in the Third Report of the disruption to the accident scene road beyond the already-known reconfiguration. *See* Doc. 186-3 at PAGIED 5588 ("Following the crash, in 2022 the crash scene road

---

[5] Plaintiff's counsel has elsewhere stated that the "disruption to the accident scene" is visually "obvious." Doc. 186 at PAGEID 5532.

was modified by Zemba Bros. . . .  Zemba Bros. built a new parallel road to the east of, and above the crash scene road hill.  The new road was relatively level, had no curve, and was properly banked."); *id.* at PAGIED 5594 (mentioning the "alternate path" created after the crash); *id.* at PAGEID 5603. Tellingly, Crawford did not modify his calculations as to the curve angles, downgrade, or cross-slope of the accident road – his Third Report included the exact same numbers as the Second Report contained.  *See* Doc. 186-3 at PAGEID 5591-5592 (reporting a left-hand turn between 105 and 120 degrees, a right-hand curve between 70 and 90 degrees, a downgrade between 21 and 25 percent, and a cross-slope of between 11 and 13 percent); Doc. 186-2 at PAGEID 5574-5575.

The new "fact" which the Third Report instead addresses does not relate to the physical changes to the road but rather to Zemba's motive in creating the new section of road.  Paisley testified that Zemba built the new section – straighter and not as steep as the old section – because it would be easier for its dump trucks to use.  *See* Paisley Dep. at 87-89.  When asked by plaintiff's counsel, over an objection, if the new section was "safer" than the old one, Paisley agreed.  *See id.* at 87-88.

The Third Report treats Paisley's testimony as an admission that the old road was "unsafe." Doc. 186-3 at PAGEID 5588.  In the section of his report entitled "Conclusions and Opinions," Crawford states:

> A proximate cause of this crash and the resultant injuries to Ms. Mann was the failure to properly design, construct, and maintain the gravel road at the crash location pursuant to industry standards.  This improperly designed, constructed, and maintained gravel road was **unsafe** for most motor vehicles at any speed, as Zemba Bros. testified related to their motor vehicles, but especially so for the LNKBox unsafe, commercial combination vehicle being operated by an untrained and unqualified driver.  It was too steep, situated on the side of a hill immediately at/after a curve, and without proper superelevation or drainage ditches.  Bryan Paisley, the corporate representative of the road construction company Zemba Brothers, Inc., indicated that the gravel road at the crash location was **not safe** for their dump trucks to use when working on roads in 2022.

*Id.* at PAGEID 5603 (emphasis added).

Not only has Crawford mischaracterized Paisley's testimony – insofar as Paisley testified that the new section was safer, not that the old section was unsafe – but the Third Report does not include any reconsideration of the conditions of the accident-scene road in light of Paisley's testimony about dirt being placed on top of it during the 2022 reconfiguration.  The Court thus finds that the Third Report is not responsive to "information that was not available at the time" of the Second Report. *Antioch*, 2016 WL 8257680, at *2.  As such, plaintiff's disclosure of the Third Report does not qualify as a supplemental disclosure under Rule 26(e).

### C. Whether the Untimely Disclosure is Substantially Justified or Harmless

Plaintiff argues in the alternative that her late disclosure is substantially justified or harmless under Rule 37(c)(1). A court should consider the following factors in determining if a late disclosure is substantially justified or harmless:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 747-48 (6th Cir. 2015) (internal quotation marks omitted).

The first factor of surprise weighs strongly against plaintiff. The Third Report was indeed a surprise. Following the grant of prior extensions, the Court set a strict deadline of August 26, 2024 for the production of primary expert reports. *See* Doc. 121. It also set a dispositive motion deadline of December 20, 2024, and advised the parties that no further extensions would be granted. *See id.* Plaintiff waited until after these deadlines to disclose the Third Report, and she did so only once defendants' motions for summary judgment were filed.

The second factor of curability and the third factor of trial disruption also weigh against plaintiff. To provide full context, the Court notes that the additional scope of Crawford's Third Report (as compared to the Second Report) went beyond addressing Paisley's purported admission that the accident-scene road was unsafe. Crawford added content discussing the Federal Highway Administration's standards for the design and maintenance of gravel roads, the classification of the tram as a "commercial vehicle," and the resulting implications under federal and state law. *See* Doc. 186-3 at PAGEID 5589, 5592-5593, 5599-5602. These standards and considerations were ones that could and should have been addressed in an earlier report. *See id.* at 5584-5585 (Crawford referencing, for the first time in his Third Report, manuals and other publications which have publications years of 2000, 2002, and 2015). Because all of this additional material was first disclosed in the Third Report, defendants did not have notice of Crawford's new opinions until after the close of expert and fact discovery and after defendants had moved for summary judgment. The Court does not believe that reopening discovery for defendants to attempt to cure the surprise from the untimely disclosure is an appropriate remedy. The parties received a prolonged period in which to conduct discovery, giving plaintiff more than ample time to prepare expert reports. As indicated by the Court's order stating that no further scheduling extensions would be granted, the Court will keep the discovery period closed and maintain the current trial date. *See* Doc. 209 (setting a trial date of July 13, 2026).

18

Regarding the fourth factor, defendants acknowledge that the new matters addressed in the Third Report have importance.  Nonetheless, the Court agrees with the statement which many courts have made that "importance cannot, by itself, save improperly disclosed evidence from being found unjustified or non-harmless."  *EQT Prod. Co. v. Magnum Hunter Prod., Inc.*, No. 5:16-CV-150-JMH-REW, 2017 WL 2295906, at *5 (E.D. Ky. May 25, 2017) (internal quotation marks omitted); *accord ChampionX, LLC v. Resonance Sys., Inc.*, No. 3:21-CV-288-TAV-JEM, 2024 WL 5188040, at *5 (E.D. Tenn. Dec. 20, 2024); *Ravin Crossbows, LLC v. Hunter's Mfg. Co., Inc.*, No. 5:23-CV-598, 2024 WL 3253264, at *6 (N.D. Ohio July 1, 2024).  And as other courts have held, the "more important the proof . . . the greater the harm in tardy disclosure." *EQT Prod.*, 2017 WL 2295906, at *5 (citing cases).

Finally, as discussed above, plaintiff has not provided a satisfactory explanation for the late disclosure of the Third Report.  The reconfiguration of the accident road was known to plaintiff several months in advance of the deadline for primary expert reports.  To the extent Paisley's deposition revealed a new fact (the placing of dirt on the old section of road) the Third Report does not address that fact.

Accordingly, the Court finds that plaintiff's untimely disclosure of Crawford's Third Report is not substantially justified or harmless.

### D.	Summary

The Court concludes that the Third Report does not qualify as a supplemental disclosure under Rule 26(e) and that its untimely disclosure is not substantially justified or harmless under Rule 37(c)(1).  Accordingly, Crawford's Third Report is excluded from consideration, *see* Fed. R. Civ. P. 37(c)(1), *Vaughn*, 18 F. App'x at 263, and defendants' motion to strike is GRANTED.

Defendants also seek an award of the attorneys' fees they expended in preparing the motion to strike.  Though Rule 37(c) permits a district court to award attorneys' fees as an additional or alternative sanction, *see* Fed. R. Civ. P. 37(c)(1)(A), the Court declines to do so.  The Court finds that the sanction of excluding the report is an appropriate and sufficient remedy under the circumstances.

## IV.	Negligent Retention

The Amended Complaint asserts claims against Apex and Trickle for negligent retention.  It alleges that each defendant owed a duty to exercise ordinary care in hiring, training, supervising, and retaining employees and agents who worked at the 2021 Lost Lands festival.  Without further elaboration, the Amended Complaint alleges that defendants breached their duties.

19

Under Ohio law, a plaintiff must prove the following five elements to impose liability on an employer for a claim of negligent hiring, supervision, or retention: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's knowledge of the employee's incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) a causal link between the employer's negligence in hiring, supervising, and retaining and the plaintiff's injuries." *Est. of Barney v. PNC Bank, Nat. Ass'n*, 714 F.3d 920, 929 (6th Cir. 2013) (citing *Lehrner v. Safeco Ins./American States Ins. Co.*, 171 Ohio App.3d 570, 872 N.E.2d 295, 305 (2007)).

Apex and Trickle have moved for summary judgment on the negligent retention claim. Apex argues, among other things, that a negligent retention claim does not extend to the hiring of independent contractors and that, even if it did, there is no evidence to show Apex had actual or constructive knowledge of incompetence of the part of any of the entities with whom it contracted to put on the festival. Trickle argues that there is no evidence that it hired, trained, supervised or retained the entities responsible for supplying and operating the tram (LNKBox, FlexTram, Axford) or the entities potentially responsible for the design, construction, and condition of the accident road (Apex, Zemba, AEG/Madison House).

Plaintiff's response brief to the motions for summary judgment does not address defendants' arguments. Indeed, plaintiff does not mention the negligent retention claim at all. In the section of her brief entitled, "The Basis of Liability," *see* Doc. 175 at PAGIED 5351-5354, plaintiff discusses the basic principles of negligence and premises liability but not negligent retention.[6]

Defendants supported their motions with legal and factual arguments and citations to the record. The Court finds that plaintiff's failure to respond to defendants' arguments amounts to an abandonment of her negligent retention claims against Apex and Trickle. *See Brown v. VHS of Mich.,*

---

[6] In a portion of her brief discussing premises liability, plaintiff states that her expert, James Crawford, "was particularly critical of the inexcusable failure of [Apex and Trickle] to properly oversee and manage the transportation vendor [LNKBox]." Doc. 175 at PAGEID 5354 (citing the Third Report). Crawford opined in his Third Report that a proximate cause of the accident was "the failure of event organizers to make a careful and critical examination of LNKBox's vehicle specifications and Axford's qualifications." Doc. 186-3 at PAGEID 5602.

Even if this passing statement could be construed as relating to the negligent retention claim, it would not save the claim from summary judgment. The Court has struck the Third Report for the reasons stated in Part III above. Moreover, it is unclear how Crawford, an accident reconstructionist, is qualified to opine either on a festival organizer's duty in vetting its vendors or on proximate causation in that regard. And, critically, plaintiff's brief itself fails to address the elements of a negligent retention claim or respond to defendants' arguments.

*Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (holding that a "plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment"); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (recognizing that a plaintiff's failure to respond to arguments made in a motion for summary judgment constitutes abandonment of a claim); *Tonkovich v. Gulfport Energy Corp.*, No. 2:12-CV-38, 2012 WL 6728348, at *2 (S.D. Ohio Dec. 28, 2012) (same and collecting cases).  The Court thus grants summary judgment to Apex and Trickle on the negligent retention claims.

## V.      Negligence

### A.      Premises Liability and the Duty Owed to a Business Invitee

Plaintiff's negligence claims against Apex and Trickle are based on premises liability.  "To establish negligence in premises liability, the plaintiff must show the existence of a duty, a breach of that duty, and an injury proximately resulting from the breach of duty."  *Yatsko v. Graziolli*, 458 F.Supp.3d 702, 724 (N.D. Ohio 2020) (citing *Armstrong v. Best Buy Co.*, 99 Ohio St. 3d 79, 81 (2003)).

In examining the existence and scope of a duty, the Court notes the parties agree that plaintiff Mann was a business invitee at the Lost Lands festival.  *See* Doc. 169 at PAGEID 5162; Doc. 170 at PAGEID 5182; Doc. 175 at PAGEID  5353.  "[B]usiness invitees are those persons who come upon the premises of another, by invitation, express or implied, for some purpose which is beneficial to the owner."  *Baldauf v. Kent State Univ.*, 49 Ohio App. 3d 46, 47, 550 N.E.2d 517, 519 (1988); *see also Albright, ex rel. Albright v. Univ. of Toledo*, No. 01AP-130, 2001 WL 1084461, at *3 (Ohio Ct. App. Sept. 18, 2001) (person who was on the premises to attend a concert was a business invitee).

A property owner or occupier owes business invitees a duty to exercise reasonable care to protect them from an unreasonable risk of physical harm.  *See Jackson v. Kings Island*, 58 Ohio St. 2d 357, 359, 390 N.E.2d 810, 812 (1979); *Paschal v. Rite Aid Pharmacy, Inc.*, 18 Ohio St. 3d 203, 203, 480 N.E.2d 474, 475 (1985) (per curiam) ("An owner or occupier of premises owes business invitees a duty of ordinary care in maintaining the premises in a reasonably safe condition so that its customers are not unnecessarily and unreasonably exposed to danger.").  A business owner has a duty to either remove or warn its invitees of dangerous latent conditions or defects of which the business owner knew or should have discovered through reasonable inspection of the premises.  *See Kolsto v. Old Navy, Inc.*, 2004-Ohio-3502, ¶ 3, 2004 WL 1486114, at *1 (Ohio Ct. App. July 2, 2004); *Hartman v. Meijer Stores Ltd. P'ship*, 2010-Ohio-5311, ¶¶ 14-15, 2020 WL 4340644, at *2 (Ohio Ct. App. Nov. 1, 2010).  As the Ohio Supreme Court has held:

21

> The occupier must not only use care not to injure the visitor by negligent activities, and warn him of latent dangers of which the occupier knows, but he must also inspect the premises to discover possible dangerous conditions of which he does not know, and take reasonable precautions to protect the invitee from dangers which are foreseeable from the arrangement or use.  The obligation extends to the original construction of the premises, where it results in a dangerous condition.

*Perry v. Eastgreen Realty Co.*, 53 Ohio St. 2d 51, 52, 372 N.E.2d 335, 336 (Ohio 1978) (per curiam).

A business owner, however, is not an insurer of its customer's safety against all risk or injury. *Kessler v. Off. Max, Inc.*, 2002-Ohio-1039, 2002 WL 378081, at \*2 (Ohio Ct. App. March 12, 2002) (citing *Paschal*, 18 Ohio St.3d at 203, 480 N.E.2d at 475).  The owner or occupier does not have a duty to protect business invitees from dangers "which are known to such invitee or are so obvious and apparent to such invitee that he may reasonably be expected to discover them and protect himself against them."  *Sidle v. Humphrey*, 13 Ohio St.2d 45, 45, 233 N.E.2d 589, 590 (Ohio 1968).

## B.        Existence of a Duty

Though acknowledging the general principles of premises liability, defendants emphasize that they did not own the land where the accident took place.  Apex leased the grounds from Trickle.  And while Trickle did own a significant portion of the festival grounds, the particular location where the accident occurred was owned by a neighbor.  *See* Trickle Dep. at 27.

Defendants' argument about ownership goes to whether they owed a duty to Mann.  The Court readily finds that they did.  Possession and control, not ownership, of the premises are the critical components needed to impose a duty of care to a business invitee.  *See Simpson v. Big Bear Stores Co.*, 73 Ohio St. 3d 130, 132, 652 N.E.2d 702, 704 (Ohio 1995) ("It is fundamental that to have a duty to keep premises safe for others one must be in possession and control of the premises."); *Monnin v. Fifth Third Bank of Miami Valley, N.A.*, 103 Ohio App. 3d 213, 222, 658 N.E.2d 1140, 1146 (Ohio Ct. App. 1995) ("Possession and control are therefore two required elements of premises liability.").  It is undisputed that Trickle acquired full rights to possess and control the land containing the accident road for the 2021 festival.  *See* Doc. 133-3 at PAGEID 2674 (lease agreement stating that Trickle "owns, controls and manages the Site"); *see also id.* at PAGEID 2692.  Trickle in turn granted Apex the right to enter, possess and have "exclusive use" of the grounds "as a concert and event venue." *Id.* at PAGEID 2674.  Both defendants had possession and control of the festival grounds, and each agreed to have certain responsibilities for the condition of the site during the term of the lease.  *See id.* at PAGEID 2676.  The Court thus finds that Apex and Trickle owed a duty to Mann as a business invitee.  *See Simpson*, 73 Ohio St. 3d at 132, 652 N.E.2d at 704 (stating that control is the power and

22

right to admit people to the premises and to exclude people from it") (internal quotation marks omitted); *see also Albright*, , 2001 WL 1084461, at *5 ("The element of control is required as a predicate to liability because the possessor of the land is thought to be in the best position to diminish dangers to invitees.").

### C.     Breach of Duty

Turning to breach, Apex correctly observes that the Amended Complaint leaves open several possible theories on plaintiff's part. *See* Am. Compl., ¶ 125 (alleging, without further clarification, that Apex breached its duty of care by "failing to provide a reasonably safe Event"). One theory would be negligence with respect to the tram equipment, including the design, construction, and selection of the tractor and trailers used at the festival. A second would be negligence regarding the operation of the tram, including the selection and training of the driver, as well as the driver's care in operating the tram. A third would be negligence concerning the condition of the surface of the accident road during the festival, including the possible spreading of wood chips and gravel in response to rainy conditions in the days before the accident. Lastly, a fourth would be negligence with respect to the pre-festival characteristics of the accident road, including its placement, design, construction, and general condition.

Plaintiff's response brief pursues the final theory. *See* Doc. 175 at PAGEID 5354-5357. In particular, plaintiff argues that Apex and Trickle are liable for the presence of a dangerously steep and curved gravel road on the premises. Plaintiff contends that defendants had a duty to remove the dangerous road conditions prior to the 2021 Lost Lands festival but failed to do so.

Plaintiff's response brief also arguably pursues the third theory. The brief contains several references to wood chips and/or gravel being spread on the festival grounds. *See id.* at PAGEID 5348, 5350, 5359. It also argues, citing Crawford's report, that placing wood chips on the road would have made the road more slippery. *See id.* at PAGEID 5350.

The Court will address both theories below, starting with the third one. In either case, in order for a business invitee to recover for injury caused by a hazard on defendant's premises, a plaintiff must establish one of the following:

1.  That the defendant through its officers or employees was responsible for the hazard complained of; or

2.  That at least one of such persons had actual knowledge of the hazard and neglected to give adequate notice of its presence or remove it promptly; or

23

3. That such danger had existed for a sufficient length of time reasonably to justify the inference that the failure to warn against it or remove it was attributable to a want of ordinary care.

*Holly v. Walmart Real Est. Bus. Tr.*, 262 F.Supp.3d 532, 536 (N.D. Ohio 2017) (citing *Johnson v. Wagner Provision Co.*, 49 N.E.2d 925, 928 (Ohio 1943)). *See also Hernandez-Butler v. Ikea U.S. E., LLC*, 435 F.Supp.3d 816, 827 (S.D. Ohio 2020).

### 1. Adding Wood Chips or Gravel to the Road

Rain fell on the festival grounds earlier in the week of the accident. *See* Abel Dep., Vol. II (Doc. 162) at 358, 392; Cheek Dep. at 72; Mann Dep. at 56. There is no evidence about how much rain fell, but it was enough for Apex and/or Madison House to close the campgrounds due to concerns about vehicles driving on the grass and turning the grass into mud. *See* Abel Dep, Vol. I at 260-61; Abel Dep., Vol. II at 392; Mann Dep. at 56. The campgrounds were reopened on Friday, September 24, once the rain stopped. *See* Abel Dep, Vol. I at 262; Abel Dep., Vol. II at 392; Mann Dep. at 56.

Plaintiff does not argue that the campgrounds should have remained closed. Nor does she argue that the roadways, including the accident road, were so muddy that they should have been closed to trams or other vehicles. Rather, she argues that it was negligent to place wood chips or gravel down as a means of drying out the road.

The factual record is thin at best regarding whether any materials were spread on the accident road in response to the rain. Chad Cheek, vice president of operations for Madison House, testified that when it rains, the site operations team's "standard protocol is to try to dry out the – dry out areas, so we used wood chips, gravel, anything available to try to repair the grounds." Cheek Dep. at 72. When asked for more detail about when and where it was spread, Cheek testified, "I don't recall the specifics . . . . It's gravel, wood chips. It would be what was necessary to repair the grounds . . . . The grounds are a very large area. I don't know the specifics of when and where and how." *Id.* at 76-77; *see also id.* at 79 (reiterating that he did not know the specific locations where gravel or wood chips were used); Miller Dep. at 29, 91, 126 (site operations team member testifying that he did not recall specifically putting gravel on the accident road).

Zemba's Bryan Paisley testified that he did not know anything about wood chips or gravel being spread on the accident road during the 2021 festival. *See* Paisley Dep. at 104. When shown a photograph of the accident and asked if he could see any wood chips or gravel compacted in the

24

road's surface, Paisley answered ambiguously, "Yeah. No." *Id.* at 110.  Paisley was not asked to clarify his answer.

Despite the threadbare evidence, the Court will assume for argument's sake that woods chips or gravel were spread on the road before the accident.  Plaintiff still must show that doing so created a dangerous condition and that Apex or Trickle were liable for the hazard under one of the three means of establishing liability outlined in *Holly*, 262 F.Supp.3d at 536.

Plaintiff cites Crawford's Third Report in support of the proposition that adding wood chips or gravel to the road created a dangerous condition.[7]  Crawford assumed that "[o]n the day of the crash pieces of loose gravel and wood chips were inappropriately dumped" on the accident road.  Doc. 186-3 at PAGEID 5593; *id.* at 5586 (assuming that "festival staff decided that gravel and wood chips were to be added to the road ostensibly to add traction").  Crawford stated that "adding wood chips decreased the traction of the road because wood chips do not adhere together and do not adhere to the gravel/dirt composition of the road/path, therefore making the road/path more slippery." *Id.*

The Court, of course, has excluded Crawford's Third Report from consideration.  Serving as another example of why it should be stricken, Crawford's opinion about wood chips making the road more slippery could have been, but was not, included in his Second Report.  The Second Report expressly acknowledges Cheek's deposition testimony (given a year earlier in July 2023) about wood chips and gravel being spread to dry out the festival grounds.  *See* Doc. 186-2 at PAGEID 5567.  But Crawford did not offer an opinion on wood chips in his Second Report.

Putting aside Crawford's Third Report, there nonetheless is evidence to support an inference that adding wood chips or gravel to the road created a hazard.  The Second Report focused on the addition of gravel (not wood chips).  According to Crawford, "the large loose gravel installed on the day of the crash reduced available traction." *Id.* at PAGEID 5576.  *But see* Paisley Dep. at 104-05 (testifying that adding gravel would help improve traction on a wet road).  Separately, Paisley testified that wood chips should not be added to a wet road because they "turn to mush." *Id.* at 99.

Plaintiff's claim, however, fails at the next step.  She has not shown, or even attempted to show, that Apex or Trickle are liable for the allegedly dangerous condition resulting from the addition of woods chips or gravel to the accident road.  Again, plaintiff can establish liability by making one of the following three showings: defendant, through its officers or employees, was responsible for the

---

[7] Plaintiff also cites the testimony of Steve Trickle, who said that "you would not use wood chips on a road."  Doc. 175 at PAGEID 5359 (citing Trickle Dep. at 139).  Not only is Trickle a lay witness, not an expert, but he did not provide a basis or rationale for his statement.

hazard; defendant had actual knowledge of the hazard and failed to act; or defendant had constructive notice of the hazard and failed to act. *See Holly*, 262 F.Supp.3d at 536; *Robertson v. Taylor*, No. 1:23 CV 891, 2023 WL 6603188, at *5 (N.D. Ohio Oct. 10, 2023).

The first method of establishing liability applies when defendant was the one who created the hazardous condition. *See Hernandez-Butler*, 435 F.Supp.3d at 827 (citing *Ray v. Wal-Mart Stores, Inc.*, 2013-Ohio-2684, at ¶ 22, 993 N.E.2d 808 (Ohio Ct. App.)); *Kubiak v. Wal-Mart Stores, Inc.*, 132 Ohio App.3d 436, 441, 725 N.E.2d 334, 337 (Ohio Ct. App. 1999) (stating the principle that proof of creation satisfies the need for proof of knowledge). Here, there is no evidence that Apex or Trickle either made the decision to add materials to the road or that they performed the action of spreading any materials. Madison House and its vendors were responsible for placing down wood chips and gravel. *See* Cheek Dep. at 74-81. Plaintiff acknowledges this point in her brief. *See* Doc. 175 at PAGEID 5359 (attributing the spreading of wood chips and gravel to Madison House).

Plaintiff also has failed to make a showing of actual knowledge. Apex's representative testified that he was unaware of Madison House's site operations team using gravel or mulch on the festival roadways. *See* Abel Dep., Vol. I at 284-85 (testifying that he was aware only of mulch being placed around a concert stage). Likewise, Steve Trickle testified that he did not witness or know anything about wood chips or gravel being spread on the roadways. *See* Trickle Dep. at 139, 181. *See also* Miller Dep. at 125-26 (site operations team member stating that he talked with Trickle on September 24, but he did not recall talking to him about adding gravel).

Turning to constructive knowledge, plaintiff has failed to argue or show that the addition of wood chips or gravel to the accident road existed for a sufficient length of time to support an inference that Apex or Trickle should have known about it. Although the exact timing is unclear, it is likely that the wood chips or gravel would have been spread within a day or so of the accident. *See* Cheek Dep. at 77; Miller Dep. at 89. Plaintiff has not set forth any facts or law to establish that either Apex or Trickle should have inspected the grounds during the festival, or with what frequency or particularity they should have conducted inspections. In the absence of such support, the Court finds that it was reasonable for Apex – which hired Madison House to have a site operations team on hand to deal with issues relating to the conditions of the grounds and roadways – to not conduct inspections of the roadways while the festival was being held. *See* Abel Dep., Vol. I at 239 (stating that Apex had no involvement with the roadways once the festival started); Doc. 142-13 at PAGEID 3818, 3824-3827 (Services Agreement between Apex and Madison in which Madison House agreed to have a site operations team during the festival to handle, among many other things, traffic and parking, safety

26

and contingency plans for weather events, management of campground areas, and execution of plans for "road repair"). Even more so for Trickle, which held the land rights, leased them to Apex, and did not play a role during the festival with respect to traffic, parking, patron transportation, or road condition management. *See* Trickle Dep. at 76-77

Accordingly, the Court finds that Apex and Trickle are entitled to summary judgment on plaintiff's claim that they are liable for the slippery condition of the road allegedly caused by wood chips or gravel being spread on it during the festival.

### 2. Pre-Existing Characteristics of the Road

Plaintiff's most straightforward theory against Apex and Trickle is her strongest one: the section of gravel road where the accident occurred had two curves, a downgrade, and a cross-slope which made it unsuitable for use by tram. She argues that Apex and Trickle, as occupiers of the land, had a duty to remove the dangerous condition prior to the 2021 festival.

### a. Whether the Road was Hazardous

On the issue of whether the accident road was hazardous, Crawford's Second Report points to several dangerous aspects of the road.[8] Crawford measured the angle of the two curves which Axford, the tram driver, attempted to negotiate. The first was a "sharp" left-hand turn between 105 and 120 degrees which Axford made as he reached the top of the hill. Doc. 186-2 at PAGEID 5575. The second curve almost immediately followed the first and was a right-hand turn between 70 and 90 degrees. *See id.* Crawford used the following two images to illustrate:



**Introtech scale drawing illustrating the general path of travel of the FlexTram combination vehicle**

---

[8] As discussed above, there is evidence that the profile of the hill may have changed before Crawford conducted his site inspection. When Zemba constructed a new section of road in 2022, it moved dirt on top of the section of road where the accident happened. *See* Paisley Dep. at 91, 142. Though Crawford had this information and conducted further inquiry before preparing his Third Report, he reported the same calculations as to the curves, downgrade and cross-slope as he had presented in the Second Report. The Court therefore treats the Second Report's calculations and the opinions based on them as representing plaintiff's position as to the dangerous nature of the road.



**Introtech image of the approach to the crash site**

*Id.* at PAGEID 5574-5575.  Crawford opined that "[n]egotiating these turns while towing two nearly fully loaded trailers which were designed with rigid suspension (the air pressure in the tires was not an effective suspension system) likely caused the nearly fully loaded trailers to begin to tip."  *Id.* at PAGEID 5575.

Crawford measured the downgrade of the road to be between 21 and 25 percent.  *See id.* at PAGEID 5573.  He stated, "The 21 to 25% downgrade on this path was extremely steep and unsuitable for any vehicle, especially the nearly fully loaded FlexTram combination vehicle in this crash.  Federal and State documents do not allow paved or dirt roads, even in hilly or mountainous areas, to exceed 15 to 17%."  *Id.* at PAGEID 5574 (citing a source identified as "A Policy on Geometric Design of Highways and Streets (AASHTO Green Book)" and citing the Ohio Department of Transportation's "Location and Design Manual – Volume 1 (Roadway Design)").

Turning to cross-slope (also called super-elevation), Crawford reported it to be between 11 and 13 percent through the right-hand curve.  *See id.* at PAGEID 5575.  The road tilted downwards to Axford's left side.  Crawford provided the following images to illustrate the cross-slope:



*Id.* Crawford added:

> Rounding the final right bearing curve while accelerating likely caused the trailers to begin to slip sideways similar to 'cracking the whip' and tip further, resulting in exceeding the critical tipping point. Beyond the critical tipping point, the rollover of the nearly fully loaded FlexTram combination vehicle was inevitable. It was completely foreseeable that an injury or fatal crash would likely occur when patrons were allowed to be transported by the FlexTram combination vehicle along this patently unsafe route.

*Id.* at PAGEID 5576.

In his conclusions and opinions, Crawford called the accident road an "inherently dangerous path." *Id.* at PAGEID 5582. He based his statement on the "excessive [down]slope of 21–25%" which exceeded federal and state roadway design guidelines and on the "steep super-elevations immediately following a turn." *Id.* Crawford opined that the dangerous attributes of the road were a proximate cause of the accident. *See id.* He stated that a crash was a foreseeable result of attempting to operate "a long combination vehicle including two nearly full trailers" on the road. *Id.* He added that the tram "should never have been allowed to operate" on the road. *Id.*

The Court finds for purposes of the motions for summary judgment that plaintiff has submitted evidence from which a jury could find that the accident road contained one or more

dangerous conditions.  A jury could further find from the evidence that transporting patrons with the tram on the road was unsafe and that an accident was foreseeable.

### b.        Defendants' Liability for the Road's Conditions

Defendants do not attempt at this stage of the litigation to counter plaintiff's showing that the road was hazardous.  Rather, they argue that they were not responsible for the road and had no knowledge, actual or constructive, of its dangerous conditions.

Apex and Trickle argue that they are not responsible for creating the allegedly hazardous characteristics of the road because Zemba handled the road's design and construction.  The Court is not persuaded that defendants can so quickly pass the blame onto Zemba.  The facts suggest a more nuanced story.  Apex and Trickle, with Madison House, made the decision to create the road in 2019 in order to improve ingress and egress during the festival.  *See* Abel Dep., Vol. I at 151-52.  They decided where the road would be placed.  *See id.* at 153-54; Abel Dep., Vol. II at 333-34.  After Trickle obtained the landowner's permission, *see* Trickle Dep. at 42, Apex placed stakes to show Zemba where to put the road.  *See* Paisley Dep. at 60.

Defendants claim that once Zemba was told where to put the road, Zemba took care of the road's "design."  But Paisley testified that all Apex asked Zemba to do was "knock the topsoil off" and "knock the grass down" if needed and then "put some stone on it."  Paisley Dep. at 60.  Because a farm path likely existed where defendants wanted the gravel road to be, *see id.* at 40, it would seem that Zemba's role amounted to little more than putting stone down and compacting it.  In other words, the evidence suggests that Zemba did not exercise independent judgment in designing or creating curves, downslope, or cross-grade.  *See id.* at 39-40 (when asked if Zemba graded the road, stating that he "could assume that all we did was spread stone on it"); *accord id.* at 52-53.  Those characteristics of the road already existed and defendants simply wanted gravel placed on top.  *See id.* at 65 (testifying that Apex did not ask Zemba to alter the pre-existing "route of that path").

The record supports an inference that Apex and Trickle knew about the contours of the land when they asked Zemba to put in the gravel road.  Apex, or its predecessor Abel Management, had presented the festival for several years before identifying the path as the desired one to connect two other roads.  *See* Abel Dep., Vol. I at 38.  Brett Abel of Apex had viewed the area, including when he conducted periodic tours of the venue with Madison House in advance of each year's festival.  *See* Abel Dep., Vol. I at 97-99, 119, 123 (testifying that he toured the grounds with Madison House representatives several times over the years and that he was aware of the hill where the accident occurred).  Trickle's sole member, Steve Trickle, had farmed the land in question for the landowner

and testified that he was aware of the condition of the land. *See* Trickle Dep at 39. A jury could find from these facts that Apex and Trickle were aware, when they made the decision to hire Zemba to place gravel down on the path, that the resulting roadway would have curves, a downgrade, and cross-slope. A jury, finding such facts to be true, could determine that both defendants are responsible for the hazardous road.

Even if defendants are not responsible for the creation of the road's dangerous conditions, the evidence supports an inference that they had actual knowledge of those conditions. Apex and Trickle viewed and approved the road after its completion in 2019. *See* Abel Dep., Vol. I at 154-55. One of Abel's tours of the festival grounds with Madison House included driving on the accident road prior to the 2021 festival.[9] *See id.* at 99-100. Steve Trickle testified that he farmed the land each year and operated a tractor on the road. *See* Trickle Dep at 39, 121.

Defendants contend that they did not have specific knowledge of the road being dangerous. Though they knew the road was on a hill, they did not know that the curve angles or the percentage of downgrade and cross-slope presented a hazard. Defendants trusted Zemba to comply with all applicable regulations and standards. They further emphasize that the road did not have a history of accidents and they had never received any complaints about the road.

The Court is not persuaded that defendants are entitled to summary judgment based on this argument. A jury, applying a reasonable-person standard under Ohio law and using its own common sense, could find that the visual indicators when observing the road would put an ordinary person on alert that it presented a danger. The road sat on a hill and a reasonable person, even without knowing the exact degrees and percentages, could observe the steepness of the road, the tilt or super-elevation, and the succession of curves. They could reasonably conclude that the nature of the road would pose a danger to festival patrons. *See Perry*, 53 Ohio St. 2d at 52, 372 N.E.2d at 336 (holding that the occupier's duty extends to protecting business invitees "from dangers which are foreseeable from the arrangement or use" of the land).

As for the absence of a prior accident or complaint, the evidence leaves room for a conclusion that this fact is less compelling than it might be otherwise. The 2021 festival was possibly the first one held after the road was created. *See supra* n. 3 (noting the uncertainty in the record over whether

---

[9] A jury could find from these same facts that a reasonable landowner or occupier in the positions of Apex and Trickle would periodically view or be informed about the conditions of the land and thus would have constructive knowledge of the road's conditions. *See* Miller Dep. at 79 (stating that Abel and Steve Trickle were included in conversations prior to the 2021 festival about the conditions of the roads).

31

the road was created before the 2019 festival); Abel Dep., Vol. I at 49, 56-57 (the festival did not take place in 2020 because of the COVID-19 pandemic).  And the day of the accident, Friday, September 24, was the first full day of the 2021 festival.  *See* Miller Dep. at 88-89.  A jury could thus discount the lack of prior issues with the road.

### c.    The Tram

The Court next considers defendants' responsibility for, or knowledge of, the tram on which Mann rode when the accident occurred.  According to Crawford's Second Report, it was the combination of the conditions of the road plus the attributes of the tram which proximately caused the accident.  *See* Doc. 186-2 at PAGEID 5571, 5575-5576, 5582 (noting, for instance, the absence of an independent brake system for the trailers, the weight load the tram carried, the trailer's rigid suspension, and the length of the tram).  The Second Report does not find the tram to be inherently dangerous, but rather finds that an accident was foreseeable if patrons were transported by tram on the road in question.

Because the facts vary somewhat regarding Apex and Trickle, the Court examines the potential liability of each defendant separately.

The record provides clear evidence in support of a finding that Apex was responsible for the tram, or at least had actual knowledge of it.  Apex hired LNKBox to provide "ten (10) people mover tram trailers for patron transportation."  Doc. 106-2 at PAGEID 1322; *see also* Abel Dep., Vol. I at 214 (testifying that LNKBox was hired to meet "the needs of moving people on-site").  Abel testified that he "saw the tram units" and "was aware" of them before the 2021 festival.  *Id.* at 207, 221; *see also* *id.* at 209-10 (testifying that he had also been provided with a picture of the tram trailers, though being pulled by a vehicle different than the tractor which was actually used).

Apex has not argued or shown it did not know that trams would use the accident road.  That is, Apex does not assert that it thought the road was off-limits to the trams.  Abel testified that Apex created the 2021 Lost Lands maps which showed traffic routes and shuttle service.  *See* Abel Dep., Vol. I at 71-72, 85, 102.  Though Madison House worked with LNKBox to establish the tram routes, *see* Miller Dep. at 61, 77-78, Abel believed that all of the roads (save a crossing point of a major state route) were available for LNKBox to utilize.[10]  *See* Abel Dep., Vol. I at 103-04.

---

[10]  A jury could also charge Apex with constructive knowledge that the tram would use the road, in light of the purpose of the tram (to move patrons between the campgrounds and the concert area) and the layout of the venue.  An individual with Madison House who helped decide the tram route called the loop route an "obvious" choice that included the accident road.  *See* Miller Dep. at 60-61.

32

Thus, there is evidence from which a jury could find that Apex knew of the conditions of the road, knew of the nature of the trams, and understood that trams would, or at least could, be using the road. The trams (two trailers towed by a tractor) are relatively long and narrow. *See* Doc. 134-7 at PAGEID 2918. With the assistance of expert testimony and using its own common sense, a jury could conclude that it would be unreasonable to transport patrons on the tram using the road in question because the tram would lack the vehicle stability needed to safely navigate the curves, downgrade and cross-slope. To put it simply, a jury could find that the tram would be prone to tipping on the road. And they could determine that Apex breached its duty of care by not eliminating the hazard, either by improving the road or by making the road off-limits to trams.

Turning to Trickle, there is no evidence that it was responsible for the trams. It did not participate in the decision to use trams at the 2021 festival, nor did it not hire LNKBox to provide the trams. *See* Trickle Dep. at 35; Sampliner Dep. at 61 (stating that Apex and Madison House made the decision to use trams). Moreover, the evidence suggests that the trams were not used at the 2019 Lost Lands festival, so Trickle did not have actual knowledge of their use from a prior event. *See* Abel Dep., Vol. I at 209; Trickle Dep. at 179; Miller Dep. at 129.

The Court, however, finds that there is sufficient evidence from which a jury could determine that Trickle had actual knowledge that trams would be used at the festival and that they could be used on the accident road. Some context about Steve Trickle helps paint the picture. He was not a distant landlord but had been operating music festivals at Legend Valley "for a long time." Miller Dep. at 124; *see also* Trickle Dep. at 36. One member of the site operations team stated that he had "countless" conversations with Trickle about various details related to putting on a festival and how things "had been done before." Miller Dep. at 123-26; *see also* Trickle Dep. at 45-47, 75-78, 112, 174-75 (testifying that he had direct discussions with Madison House and interacted with them about various issues). Trickle testified that he would be on the grounds during a festival to help coordinate with the local health department. *See* Trickle Dep. at 67, 112.

Steve Trickle testified that he saw a tram tractor and trailer in 2021 prior to the accident. *See id.* at 118, 120. And the evidence supports an inference that he knew what roads would be used during the 2021 festival.[11] *See* Abel Dep., Vol. I at 118 ("Trickle Productions would have been aware of the roads we planned to use."); Trickle Dep. at 150-51 (testifying that he knew "all vehicles" would be

---

[11] As with Apex, a jury could find that Trickle also had constructive knowledge that trams would use the accident road.

33

allowed on the various roads of the festival grounds); *id.* at 192-93 (testifying that the site operations team had emailed him a map of the festival grounds prior to 2021 Lost Lands).

Given Trickle's knowledge that trams would be used and his knowledge of the nature of the accident road, a jury could find that Trickle understood the risk presented by a tram using the road and should have eliminated the hazard. In his deposition, Steve Trickle defended himself by saying he had seen only one trailer hitched to a tractor. *See* Trickle Dep. at 120 ("[W]hen I saw the trolleys, there was only one hooked to a tractor before the event when I saw them sitting there."). In his view, the addition of a second trailer behind a relatively small tractor was in large part what made the tram "destined to fail." *Id.* at 120; *see also id.* at 119, 123-26 (expressing his belief that the articulating wheels on the trailers also contributed to the accident). He believes that the force of the second trailer going downhill jackknifed the tram. *See id.* at 126. Without expressing an opinion on Trickle's contention, the Court finds that a jury should decide whether this factor of Trickle seeing only one trailer in the tram configuration is enough to relieve him of liability, or decide whether Trickle could or should have reasonably anticipated that additional trailers would be added to the trams.

### D. Summary

The Court finds that plaintiff has offered sufficient evidence to survive summary judgment on her premises liability claims that Apex and Trickle committed negligence by not eliminating the hazards posed by the accident road being used by trams to transport patrons during the 2021 Lost Lands festival.

The Court, however, finds that plaintiff has failed to present sufficient evidence in support of her claims that defendants were negligent in regard to wood chips or gravel being added to the road.

## VI. Punitive Damages

The Amended Complaint seeks punitive damages, but just for certain claims. As against Apex and Trickle, the Amended Complaint seeks an award of punitive damages on her claims of negligent retention. *See* Am. Compl. at pp. 22-23, ¶¶ V, IX. Plaintiff seeks only compensatory damages on her general negligence claims against Apex and Trickle. *See id.* at ¶¶ IV, VIII.

Because the Court has granted summary judgment to defendants on the negligent retention claims, *see* Part IV above, the punitive damages claims against Apex and Trickle are likewise dismissed.

## VII. Conclusion

For the reasons stated above, the respective motions for summary judgment (Docs. 169, 170) filed by defendants Apex and Trickle are GRANTED IN PART and DENIED IN PART. The

34

motions are granted with respect to plaintiff's claims for negligent retention, for negligence in regard to wood chips and gravel being added to the accident road, and for punitive damages.  The motions are denied with respect to plaintiff's negligence claims based on defendants' liability for the allegedly dangerous characteristics of the road when used by a tram to transport patrons during the festival.

Defendants' motion to strike (Doc. 185) the Third Report of plaintiff's expert James Crawford is GRANTED.  The Third Report will be precluded from use at trial.  Plaintiff's motion for a hearing on the motion to strike (Doc. 190) is DENIED.

_s/ James L. Graham_
JAMES L. GRAHAM
United States District Judge

DATE: February 12, 2026